Filed 3/18/14  P. v. Williams CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G047363 |
|      v. | (Super. Ct. No. 09CF1453) |
| JOHN RAY WILLIAMS, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant John Ray Williams of three counts of committing a lewd act on a child under age 14 (Pen. Code, § 288, subd. (a)),[1] and four counts of sexual penetration with a child age 10 or younger (§ 288.7, subd. (b)). The jury found defendant committed lewd acts against more than one victim (§ 667.61, subd. (c)) and, with respect to one count, engaged in substantial sexual conduct with the victim (§ 1203.066, subd. (a)(8)). The court sentenced defendant to a prison term of 30 years to life.

On appeal defendant, who suffers some mental deficiencies, contends he did not knowingly and intelligently waive his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and that his confession was involuntary. We disagree. Substantial evidence supports the court's factual determination that defendant knowingly waived his *Miranda* rights. We also conclude from our independent review of the record that defendant's statement was voluntary, and not the product of improper police coercion. Accordingly, we affirm the judgment.

FACTS

The jury convicted defendant of molesting two young female relatives. The molestations occurred in the spring of 2009, when defendant was 26 years old, and his victims, A. and E., were ages four and five, respectively. E. is the daughter of defendant's sister. A. is the daughter of defendant's cousin.

---

[1] The jury found defendant not guilty, as to one count, of the greater offense of committing a forcible lewd act on a child under age 14.

All statutory references are to the Penal Code unless otherwise stated.

2

At the time of the molestations, defendant "was in between homes" and often stayed at his sister's apartment or at the home of his cousin's mother. He had no job and collected disability benefits.

While growing up, defendant had attended special education classes. Relatives who testified at trial disagreed about the extent of his mental deficits. Some testified he suffered from Attention Deficit Hyperactivity Disorder or was hyperactive. Some relatives described him as "slow," but others disagreed. As part of the defense case, his mother, testified that when defendant was a teenager, he was diagnosed with Attention Deficit Disorder with Mental Retardation. Defendant has a bank account and an ATM card. On his own, he goes grocery shopping, runs errands, plays video games, cooks meals, carries on a conversation, communicates with the public, and takes care of his personal hygiene. He knows how to operate a vehicle and use public transportation.

*Defendant's Conduct With A.*

In the spring of 2009, A.'s mother, worked during the day. On her way to work, A.'s mother would drop off A. and A.'s younger brother at their grandmother's home. The grandmother, along with her son, would babysit the children. Sometimes defendant was there.

In April 2009, the grandmother saw defendant lying on a bed with A. on top of his private parts. Defendant was holding onto A.'s waist and moving his hips up and down. The grandmother became upset and told defendant in a raised voice, "Don't do these things in my house. She's a baby." She removed A. from him.

In early June 2009, A. told her mother about an incident with defendant that had occurred in the previous couple of weeks. A. said that defendant had her sit on him and rub her private parts back and forth. When A. told defendant to stop, he got on top of her and started "humping" her. A. demonstrated for her mother what defendant had done. Defendant also touched A.'s private parts with his hand. He did not take off the

3

child's clothes. The incident took place at the grandmother's home. Such conduct had occurred several times. A.'s mother called the police two days later.

In June 2009, a member of the Orange County Child Abuse Services Team (CAST) interviewed A. (A video recording of that interview was played for the jury.) During that interview, A. said Johnny put his "winker" on her "peepee" a lot. A. used stuffed bears to demonstrate how defendant would lie down, pick her up, put her on him, and shake her so his "winker" was on her "peepee." Defendant gave A. a coin and told her not to tell anyone.

At trial, A. testified that defendant touched his private parts to her private parts. She explained that it happened on the couch in her grandmother's living room while her uncle was looking for his shoes and her grandmother was looking for her belt. Defendant was sitting down and had told A. to come over to him. It had happened between three and eight times. A. did not initially report the touching to an adult because she was scared defendant would do something to her.

*Defendant's Conduct with E.*

Beginning in January of 2009, defendant visited his sister M.'s apartment every couple of days and occasionally spent the night there. Their mother also lived there because she babysat M.'s five children, including E., while M. was at work.

Defendant would volunteer to pick up E. from kindergarten "pretty much every day." M. lives across the street from the school so the round trip walking time is about five minutes.

One day in April 2009, defendant was gone for around 20 minutes picking up E. from kindergarten. M. was worried and wondered what was going on. When defendant finally returned with E., he walked the child to her mother while holding his hand on her back. Defendant said to M., "I don't know what's wrong with your daughter. Talk to your daughter." He then walked to the bathroom. E. "stood there with her head

4

down" and said, "Mommy, I have to tell you something." E. told M. she was bleeding. M. looked and saw a hole in the crotch area of E.'s jeans. E. was not wearing underwear. M. pulled down E.'s jeans and had her lie down. M. saw a lot of blood around E.'s vagina. E.'s knees were shaking and she seemed scared. Defendant's mother asked him, "Did you touch Lizzy? Did you hurt Lizzy?", and took him out of the room. M. questioned E. for at least an hour, but the child appeared scared and was very reluctant to answer.

In July 2009, a CAST member interviewed E. (A video recording of that interview was played for the jury.) During that interview, E. said defendant made her "pee" area bleed, because when she was four years old, he always made her "horsey ride." The horsey ride made E. bleed because it "just got hard and he keep doing it." E. added that "Grandma said [E.] can't horsey ride" and E. "listened to her." Defendant would "be sad because he wants [E.] to go horsey ride and then [she] said no." During horsey ride, defendant would lie on the bed with E. sitting on him. Defendant would move up and down and pull E. to keep her there. E. "told Grandma," and Grandma yelled at him. Defendant always told E., "Please don't tell." He would also touch her vagina underneath her clothes; it hurt when he touched it on the inside. Defendant also touched her chest and buttocks underneath her clothes. On one occasion defendant exposed his penis, grabbed E.'s hand, and made her touch it. Defendant got on top of her as she lay on her back, prevented her from leaving, and moved up and down on her. Defendant did this one hundred times, touched her vagina one hundred times, touched her buttocks eight times, and touched her chest three times.

On July 29, 2009, a child abuse pediatrician examined E. The pediatrician testified that normally a girl's labia majora (the major lips of the vagina) are separate from each other. But the pediatrician found an adhesion of E.'s labia majora where a small portion was stuck together. Labia adhesions can be caused by many things, including "just about any kind of trauma," for example "repetitive rubbing or tearing of

5

that area and then it heals up and comes together." A finger inserted into the vagina could cause such trauma.

At trial, E. testified that when defendant was alone babysitting her at the apartment, he touched her vagina, and that it hurt when he did so. Defendant told E. not to tell anyone about it. E. was afraid of defendant. Defendant made her get on top of him up to three times.

*Police Interview with Defendant About A.*

On the night of June 8, 2009, Officer Isaac Ibarra spoke with A., her mother, her grandmother, and others. He also went to defendant's mother's home and learned that defendant was at the Victory Outreach, a dormitory style facility.

Around 3:00 a.m., Ibarra walked into a Victory Outreach dormitory with a lit flashlight and asked for John Ray Williams. Some people woke up and said, "Hey, if you're John, get up." Defendant said, "That's me." He got up and spontaneously stated, "I know what this is about. It's about the little girl."

Ibarra handcuffed defendant, placed him in the back of his patrol car, told defendant he was being arrested for child molestation, and immediately read him his *Miranda* rights. After reading each *Miranda* warning, Ibarra asked, "Do you understand?", and defendant replied, "Yes." At no time did defendant say he did not understand.

During the 10- to 15-minute ride to the police station, defendant made unsolicited comments about God and about going to Victory Outreach to make himself a better person and to get away from drugs and alcohol. He said he used marijuana.

At the police station, Ibarra took defendant into an interview room, again read him the *Miranda* warnings, and started to interview him. Ibarra and defendant were

6

alone in the room. Portions of the interview were video recorded and played for the jury.[2]

Ibarra asked defendant, "[D]o you want to talk about what happened?" Defendant said he was pulling up his pants in the restroom when A. opened the door and saw his penis. Defendant told her, "[Y]ou do not open the door. You have to knock." Then A. was watching SpongeBob and defendant wrestled with her and accidentally grabbed her vagina area. A. said she was going to attack him, and he pretended to fall.

A. got on top of him and started a "humping" motion. A. said, "This is what the girls do." Defendant pushed her away and said, "I'm gonna talk to you for a second. Who — who taught you that?" A. did not answer. Defendant thought it might have been his uncle or his aunt because "they" or "he has a history of molestation." Defendant was in tears because he could not believe his uncle would do this to his own daughter. It "hurt" defendant when he found that out. Defendant also worried that maybe A. had seen it on TV.

Defendant denied molesting A. and said he had sworn this on the Bible. When A. was on top of defendant, defendant "wasn't even feeling excited, cause she's a little girl." Eventually defendant admitted that after the wrestling, he touched A. once for a second. Then defendant "took [himself] away." He knew he could not do this to A., because he knew "the consequences that could happen" and that he "was doing something wrong."

Eventually defendant admitted he had experienced sexual feelings for A. and thought of her a couple of times while masturbating in the bathroom. He admitted that one time while they were wrestling, she sat on him and he developed an erection. He

---

[2]     Ibarra testified at trial that approximately 20 minutes of the interview were not recorded because the tape ran out without his knowledge. When Ibarra got up to get defendant some water, he checked the recorder, realized the tape had run out, and inserted another tape. When he began recording again, he tried to summarize what defendant had said. The interview then continued for another 10 minutes.

7

took out his penis, put it between her legs, and moved it around.  He started feeling really good, but stopped before ejaculating.  Defendant then removed A. from on top of him and rubbed her vagina.  He then made himself go play video games.  Ibarra asked, "Do you think if you would have kept rubbing it would have led . . . to something else?"  Defendant replied, "No, cause I — I know that's a little girl, you know?"  "Those little girls *** big guys like me will hurt her, you know what I'm saying?"

*Police Interview with Defendant About E.*

On June 29, 2009, Detective Jaime Rodriguez interviewed defendant  about his conduct with E.[3]  This interview was audio recorded, and the recording was played for the jury.

Rodriguez started the interview by reading defendant the *Miranda* warnings.  Rodriguez stated:  "I'm gonna go through them a little slower, if you don't understand . . . tell me and I'll go ahead and . . . explain them to you or, read it again if I guess I have to."  After Rodriguez read each warning and asked defendant if he understood, defendant answered, "Yes" or "Yes sir."  Rodriguez then asked defendant whether he knows how to read, to which defendant replied, "Yes sir."  Rodriguez said he needed defendant to read the form of rights:  "I'm going to let you read them just to make sure you get them, again if you don't understand what you're reading let me know, and . . . we'll try to explain it to you . . . or I'll explain it to you."  Defendant said he had "one question":  "When I got arrested the police officer had done some kind of report that I didn't say at all, like putting words in my mouth you know, and if I asked . . . ."  Rodriguez said he could not talk about the other case, but defendant might want to talk with his attorney about it.  Rodriguez then explained again that the waiver form says that "those are the rights that I read to you and that you understood them."

_____
[3]    Rodriguez's partner was also present during the interview, but was silent during large parts of it.

Defendant first stated that when he played horsey with E., she sat on his back. He guessed E. saw his penis when he was wearing a towel after taking a shower and the towel fell off when he was getting his underwear out of a drawer. He picked up E. pretty much every day from her preschool class at Fairhaven Elementary School.

When asked why E. told the social worker that he put her on top of him, defendant said E. told him that her dad did something to her. When Rodriguez said E. told the social worker that Uncle Johnny is the only adult male she doesn't like (because he used to put her on his lap and play horse and she saw his penis), defendant said "[i]t was just that one time . . . ." And, he did not get excited; he is "not that sick of a person." When asked if he was "erect," he said he did not get a "hard on." (He later reiterated, "I'm not that sick of a person . . . like my uncle who would do it to his daughter.")

When asked why E.'s vagina bled, defendant said his sister told his mother that she caught E. putting a pen or pencil in her vagina and told her to never do it again. Defendant then said that, as he "was reading the reports," he noticed that the doctor said the bleeding was due to hormones. Rodriguez said the doctor said this before E. made her statements about defendant. Defendant then said that E. started "humping" when she was on top of him a couple of times, and he wondered where she learned that and thought it might be from her dad who "was a drug addict, was in prison, he just got out, he's fighting to be deported." Defendant said he did not stick anything up E.'s vagina, had told his mom he did nothing to hurt E., and had "put that on the Bible."

At one point, defendant said: "I have special needs you know. I've been in special Ed all my life, you know. I don't think about stuff before I do that." "I'm a person who has been in special Ed all my life. You can check my background, my school, . . . and you will see."

Rodriguez said: "But you seem to know what you are doing, man, I mean you got . . . a great memory. I'm asking . . . birthdays, . . . addresses, you remember

9

dates and times, . . . you seem pretty bright to me for someone to say that they had . . . special Ed since they were young."

Defendant said it would take him a long time to figure out a math problem[4] and that he "also picked up ADD." When Rodriguez said it sounded like defendant was reaching for something to blame, defendant said, "I'm stupid." "I'm saying I'm stupid." "All my life I've been called stupid." He suggested maybe he could get some help from a "physiatrist [*sic*] or doctor."

Eventually defendant admitted he inserted his finger into E.'s vagina four or five times and rubbed the outside of her vagina. He did this because he does not think before he does stuff and also because he smokes pot a lot and drinks beer. (He later explained "how they say the marijuana goes right to your brain cells and makes you dumb.") Rodriguez said: "Okay. So now we're going to blame pot and the beer aside from ADD. Is that what you're saying?" Defendant said, "Yes." Rodriguez commented that, yet, defendant has an amazing memory and "can remember in detail everything that went on." Defendant admitted he was sexually attracted to E. and sexually aroused. These incidents occurred between about October 2008 and April 2009 at his sister's apartment number 38, after defendant picked E. up from school. When asked whether he had ever "finger bang[ed] a girl before," defendant said he had done so to his ex-girlfriend who is about the same age as him. With his girlfriend, he did get sexually excited, but not with E. Defendant said he hopes to be free "even if [he has] to be on probation for years" because he is scared about what they do to people in prison.

---

[4]     Based on the colloquy of question and answer, it is apparent the transcriber wrongly attributed this statement to Rodriguez, and after this point, transposed Rodriguez and Williams as speakers for a portion of the transcript.

10

*Defense Case*

Defendant's mother testified that when she was pregnant with defendant, she had a car accident, defendant's father beat her up, and a technician forgot to put the shield over her stomach when she had an X-ray. Defendant was slow to crawl, walk, and talk. He was in special education and as a teenager began receiving social security benefits after he was diagnosed with Attention Deficit Disorder with Mental Retardation.

Dr. Deborah Davis, a psychologist, testified at length about false confessions. Mentally retarded persons are vulnerable to making false confessions because they lack the ability to resist authority effectively and they try to please people.

Dr. Kara Cross, a psychologist, testified she administered I.Q. tests to defendant in jail. Defendant was not hostile, resistant, or manipulative, but he did have trouble understanding the instructions and often needed her to repeat them. As described in more detail in the discussion part of this opinion, Cross concluded defendant is mildly mentally retarded and that he functions mentally like a four- to six-year-old child.[5]

To determine whether defendant was malingering on the tests, Cross observed him for consistency in how he presented, what he said, and how he behaved. Cross found defendant "to be completely consistent in his presentation." There was no instance where "everything got better when he forgot to fake." Cross also gave him the standardized test for malingering (the Rey 15), where "the individual is presented with 15 letters, numbers, and shapes, allowed to look at it, then the stimulus card is taken away and they are asked to draw them from memory. A score lower than six indicates malingering. A score of six or higher is considered to be valid work for "the mentally retarded population." Cross testified that defendant scored "six, which is right well within the non-malingered, very valid range for the mentally retarded."

---

[5] At the pretrial hearing on defendant's motion to exclude his confessions, Cross offered substantially the same testimony about her testing and evaluation of defendant's intelligence.

11

Cross testified that people of defendant's intelligence level have a very limited understanding of the nature and quality of why something is wrong. "Their concept of why [something] is wrong tends to be very concrete," e.g., because "Mom says so." When asked on direct examination for an example of defendant's concrete thinking in his interviews, Cross replied, "Nothing is coming to mind." Defense counsel suggested the example of defendant talking "about being a big guy and one of the children being small and what that meant." Cross testified: "Yes. The . . . concrete sense that a large person could hurt a small person. Children age four can understand that, that big boys can hurt little boys kind of concept. [¶] The understanding of why a big person should not be picking on or attempting to hurt or intimidate a small person, that level of understanding wouldn't be there. But the very concrete idea that big is bigger than small and a big person falling on a small person could hurt them. That type of understanding is present."

On cross-examination, the prosecutor asked Cross whether someone like defendant "could ever waive his *Miranda* rights and talk to the police voluntarily." Cross opined, "I would lean towards saying probably not. They don't have the ability to understand the consequences and the depth of what these concepts or constructs mean." Cross opined that defendant does not have the ability to be an abstract thinker. When the prosecutor asked whether Cross's example of defendant's concrete thinking was inapplicable, since defendant talked about "a grown man with a penis" potentially hurting a victim "if he put it in her small vagina," Cross stated: "When I read that portion of the transcript, I did not . . . get the understanding that he was talking about sexual intercourse. [¶] That he was talking about he was a big person, she was little. And it was more of a global statement, that it did not specify . . . a large person having sex with a very small person. That it wasn't related to sex. It was related to the concept of big people harming small people." When asked whether, based on her tone of voice, Cross

12

was "being an advocate," Cross stated: "I do not hear that I am advocating for anything except the statistical facts and my observations and my professional opinion."

DISCUSSION

*The Court Did Not Err by Admitting Defendant's Statement into Evidence*

Prior to trial, defendant moved in limine to exclude his incriminating statements on grounds he did not knowingly waive his *Miranda* rights and that his statements were involuntary because the officers used coercive tactics to obtain them. The court denied the motion. The sole issue on appeal is whether the court erred by denying defendant's motion.

1. *Proceedings Below*

At the January 30, 2012 hearing on Evidence Code section 402 motions, defendant presented the testimony of psychologist Cross. Cross had met with defendant in jail on October 18, 2010, and administered to him some I.Q. and other evaluative tests of his mental functioning.

Cross reported, inter alia, the following scores for defendant: His verbal I.Q. (verbal abilities) was 58, in the bottom 0.3 percent of the population. His performance I.Q. (visual, fine motor skills) was 52, in the bottom 0.1 percent of the population. His working memory index (immediate recall and simple arithmetic) was 51, in the bottom 0.1 percent of the population. His verbal comprehension (understanding and use of words, and logic) was 61, in the bottom 0.5 percent of the population, placing him in the "extremely low" and "mildly mentally retarded range for his ability to understand the English language." Cross explained: "He can understand basic commands. He can take reminders. 'You need to go brush your teeth, go do it.' He can fully understand what that means." Finally, his full scale I.Q. (weighted average of

13

subtests which shows person's "global functioning") was 51, placing him in the bottom 0.1 percent of the population.

These scores place defendant in the mildly mentally retarded classification. Cross testified that her assessment of defendant's I.Q. was consistent with an assessment of him when he was 15 years old.

A separate test — the cognitive diagnostic battery — measures an individual's "cognitive age level." It showed that defendant has the mental age of a four- to six-year-old.

Defendant also has a "conceptual disorder[,] which means he is not able to take in new information and understand and incorporate that information to make better judgments. [¶] He gets stuck on ideas. He may be able to parrot back what should be said. But to apply what should be said, 4- to 6-year-olds are not able to do that."

Cross found defendant was not malingering on the tests.

Cross opined, based on her own interaction with defendant and on watching his interview with Ibarra, that he manifested a demeanor called "yeah-saying," i.e., agreeing with the person who is talking to them. With her and with Ibarra, defendant "was not hostile or aggressive" and had "a childlike manner of wanting to be a good boy."

Finally, Cross opined that defendant, with his I.Q. of 58 and a conceptual disorder, is incapable of understanding *Miranda* rights and what it means to waive them.

Ibarra and Rodriguez then testified for the People.[6] Their testimony at the pretrial hearing was similar to their subsequent testimony at trial. When Ibarra was asked whether defendant seemed mentally slow during the drive to the police station, Ibarra replied, "No, not at all." Prior to the interview, Ibarra had spoken with defendant's sister, his cousin, her brother, and other relatives, but no one had said defendant was mentally

---

[6] Cross was the first witness, testifying out of order on behalf of defendant due to scheduling issues.

14

slow or developmentally disabled. During the interview, Ibarra had no reason to think defendant was developmentally disabled.

During his interview of defendant, Ibarra used techniques designed to motivate a suspect to admit the truth. These techniques include making the suspect think the officer has more information, minimizing the suspect's alleged behavior to make it seem more acceptable, and exhorting the suspect to clear their conscience.

Rodriguez testified that, from the very beginning of his conversation with defendant, it seemed to him that defendant "absolutely" understood what Rodriguez was telling him. Rodriguez employed interrogation techniques similar to those used by Ibarra.

The court watched and listened to the videotaped portions of defendant's interview with Ibarra and read the transcript of defendant's interview with Rodriguez. The court also engaged both counsel in a thoughtful discussion of the pertinent law and evidence.

Before announcing its ruling, the court explained it gave less weight to Cross's testimony because Cross took "more of an advocacy role than that of a true expert." The court judged her testimony from the perspective of a factfinder, and accepted parts, but not all, of her testimony. Cross gave the impression "that she believes that anyone with a mental disability, notwithstanding what the level of that mental disability would be, as long as it's below a 70 I.Q., gets a pass."

The court assigned significant weight to the videotaped recording of Ibarra's interview of defendant: "Watching that interview was very telling. You heard me make a comment earlier that at least on three occasions I've changed a ruling based on what I saw versus what I just read or what I just heard. And Mr. Williams's conduct, for lack of a better term, during that interview was very telling to me. Quite frankly, when I heard the doctor testifying I expected someone who could not function. That was the impression that I had, someone who just could not function. [¶] . . . [¶] So then I was

15

looking at the transcript, I'm listening to him, and I'm watching him. He was very aware of what's going on. When [Dr. Cross] gives the projected age range — when I said I don't accept everything that she said, I just can't accept that. We've all seen children at various ages, children and grandchildren, we have seen them at various ages. They're not always the same. Some start to walk a little faster than others. . . . [¶] But when I saw him functioning in that interview room I didn't see a low-functioning individual. Now, I'm not trained in psychology, but I'm in this business for well over 40 years, and in doing that I see a lot of people. And part of my job that I have to do is to observe witnesses, make judgments. The same thing we tell the jurors to do, judge credibility, judge believability, judge their actions, use their common sense. . . . So that's what I do when I see someone who's on trial or a witness or on video. [¶] And what I saw was someone who was not terribly high functioning. Not at all. I acknowledge that. But someone who doesn't function[] at all or is totally dependent on people being around him? If that was the case he wouldn't be living at Victory Outreach. I know what Victory Outreach is." "[W]hat I observed was an individual, Mr. Williams, functioning fairly well. He admitted that he touched [A.] And then he used his analytical ability to say, 'but I stopped because I know you can't do that. You get into trouble.' He's thinking this stuff out. . . ." The court stated it had asked Cross whether defendant demonstrated abstract reasoning when he said he knew what could happen if he continued touching her the way he was touching her, and that he could get into trouble, but that Cross "sidestepped" the issue.

The court found that defendant knowingly and intelligently waived his Miranda rights and voluntarily made the statements. Accordingly, the court ruled the statements were admissible.

16

2. *Waiver of Miranda Rights*

*Miranda* warnings[7] protect a defendant's Fifth Amendment privilege against self-incrimination. (*Moran v. Burbine* (1986) 475 U.S. 412, 420 (*Moran*).) A defendant may waive *Miranda* rights if "'the waiver is made voluntarily, knowingly and intelligently.'" (*Id.* at p. 421.) A waiver is made knowingly and intelligently if "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Ibid.*) If "the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension[, a court may] properly conclude that the *Miranda* rights have been waived." (*Ibid.*)

In examining the totality of the circumstances to determine the validity of a *Miranda* waiver, a mentally retarded defendant's subnormal intelligence is but one factor to be considered, "unless the degree of retardation is so great as to render the accused completely incapable of understanding the meaning and effect of his confession . . . . " (Annot., Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession (1981) 8 A.L.R.4th 16.)[8]

Here, defendant essentially argues that, because Cross's testimony was not refuted by an expert witness for the People, it is therefore *undisputed* that he is

---

[7] "These warnings (which have come to be known colloquially as '*Miranda* rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" (*Dickerson v. United States* (2000) 530 U.S. 428, 435.)

[8] At the outset of proceedings in this case, the court found defendant was competent to stand trial, a separate inquiry to be sure, but nonetheless a conclusion, based on the reports of two doctors (one selected by the defense and the other by the prosecution), that defendant could understand the proceedings and assist his counsel. (*People v. Frye* (1998) 18 Cal.4th 894, 951, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 420.)

completely incapable of understanding the meaning of the *Miranda* warnings and the effect of his confession. Defendant's appellate briefs reveal that, in his view, there is nothing Ibarra and Rodriguez could have done to make his statements admissible under *Miranda*. For example, he complains that Ibarra failed to give him the *Miranda* waiver form before the first interview, but then contends that, even though Rodriguez made him read the form prior to the second interview, this was a "meaningless exercise" due to his mental retardation. He complains he had no experience with *Miranda* warnings prior to hearing them from Ibarra, but then contends that, even though he was put in jail after the Ibarra interview and later given *Miranda* warnings again before the Rodriguez interview, he was "unable to learn from prior warnings." He complains Ibarra failed to elaborate beyond a mere reading of the rights, but then contends that, even though Rodriguez did elaborate on the rights, the elaboration was too slight and furthermore, Rodriguez failed to question him to confirm he truly understood them. He implicitly complains that the officers failed to adequately calibrate their explanation of the warnings to their observation and assessment of his intelligence level, but then contends that the officers' subjective belief he understood the warnings is basically irrelevant. In sum, in defendant's view, all the other circumstances surrounding the officers' giving of the *Miranda* warnings to him are trumped by Cross's opinion he is inherently incapable of ever understanding the warnings.

Indeed, on appeal defendant concedes he does *not* contend "he was improperly advised of his Miranda rights." Rather, he insists that we must take as a given that he is "a person with the mental age of a preschool or kindergarten student." Defendant's implicit premise is that, if a defense expert's opinion of a defendant's intelligence level is not disputed by contrary expert testimony, then the fact finder is bound by that opinion and lacks authority to judge the credibility of the defense expert and of the tests and data on which the expert relied.

18

Defendant's assertion runs afoul of the standard of review for *Miranda* challenges. Under that standard, a reviewing court independently determines "from the undisputed facts, and those properly found by the trial court," whether a *Miranda* violation has occurred. (*People v. Johnson* (1993) 6 Cal.4th 1, 23, 25, disapproved on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879.) The reviewing court "must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported." (*Johnson*, at p. 25.) "[W]hether a particular defendant understood and knowingly waived his rights is essentially a factual question, which we review only for substantial evidence." (*People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1173, fn. 2; *People v. Lewis* (2001) 26 Cal.4th 334, 384 [detective's testimony — which trial court credited — supported trial court's finding defendant intelligently and knowingly waived his rights].) "[I]f there is conflicting testimony on whether a defendant waived his *Miranda* rights, 'we must accept that version of events which is most favorable to the People, to the extent that it is supported by the record.'" (*Lewis*, at pp. 383-384.) Furthermore, "the fact finder determines the facts, not the experts. Indeed, the fact finder may reject even 'a unanimity of expert opinion.'" (*In re Scott* (2003) 29 Cal.4th 783, 823.)

Whether defendant was mentally capable of understanding the *Miranda* warnings was a disputed fact. Cross's expert testimony that defendant lacked the requisite mental capacity was simply the opinion of one psychologist based on tests scientifically accepted at that time and selected by Cross to administer to defendant. Test scores do not represent an immutable truth, but instead, like scientific theories, are subject to change and may be flawed. They are also subject to human error by the person administering them. As to Cross's choice of tests, the record does not show she ever gave defendant a "legal forensic test, referred to as the 'Grisso test,' to determine his ability to understand the *Miranda* waivers." (*People v. Jenkins*, *supra*, 122 Cal.App.4th at p. 1169.) "*Grisso* tests are widely used and recommended psychological tests designed

19

to help assess ability to understand and appreciate *Miranda* warnings." (Frumkin et al., The Grisso Tests for Assessing Understanding and Appreciation of Miranda Warnings with a Forensic Sample: Behav. Sci. Law 30 (2012) pp. 673-692.)

"""Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood.""" (*People v. Lewis*, *supra*, 26 Cal.4th at p. 384.) "There is no 'bright line' test in this area, in terms of a level of impairment that determines whether a person can validly waive his or her rights. Courts have found defendants with I.Q.s of 60 or less to have validly confessed or waived their rights . . . ." (Menninger, II, Invalidity of Confession or Waiver of Miranda Rights by Mentally Retarded Person, 42 Am.Jur. P.O.F.3d 147 (1997) § 7, fn. omitted.) "The ability to make a valid waiver depends on the individual's capabilities and the circumstances of the interrogation." (*Ibid.*) Furthermore, intelligent knowledge in the *Miranda* context "need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy . . . ." (*People v. Bernasco* (Ill. 1990) 562 N.E.2d 958, 964.) As the court stated, most suspects interrogated by law enforcement officers are at a disadvantage during the interviews because they are not lawyers and have no legal training. If a mentally retarded suspect cannot be questioned by law enforcement, yet requires no institutionalization or other governmental supervision, society may be rendered defenseless against that person's criminal behavior.[9]

---

[9] "With the trend away from institutionalization of mentally retarded persons, and their increasing integration into 'normal' society, the criminal defense attorney is more likely than ever to be representing clients who fall into that category." (Menninger, II, Invalidity of Confession or Waiver of Miranda Rights by Mentally Retarded Person, 42 Am.Jur. P.O.F.3d 147, *supra*, § 1.)

We therefore apply the substantial evidence standard of review to the court's finding defendant's *Miranda* waiver was knowing and intelligent. The court accorded great weight to defendant's conduct during the videotaped *Ibarra* interview, as well as to the officers' perception he did not appear mentally slow either before or during the interviews. The court found defendant was not terribly high functioning, but was functioning fairly well. This finding is supported by the transcripts of defendant's give-and-take colloquies with Ibarra and Rodriguez in the interviews. Defendant's answers showed he was not confused, was thinking clearly, and understood the officers' questions (and even, to some extent, their strategy, as he sought to mislead them).

Contrary to Cross's testimony, defendant displayed no yeah-saying during much of the interviews. Rather, he strongly denied the officers' accusations. When he made admissions, he made them cautiously. He never admitted, despite Rodriguez's questioning, that he ever touched E.'s vagina with his penis. Nor did defendant try to appear smarter than he is, as Cross testified he would. Rather, he insisted he was "stupid" in an effort to escape legal liability, an obvious motive for possible malingering on the psychological tests subsequently administered by Cross.

Defendant's statements showed a level of thinking deeper than a four- to six-year-old's fear of getting in trouble for breaking parental rules. For example, he initially insisted he is not such a sick person or a pervert, thereby demonstrating his awareness that child molestation is considered to be abnormal. His assertion that he was in tears when thinking about his uncle molesting his own daughter reveals his comprehension of the wrongfulness of the act and of the harm suffered by young victims. His recognition that A. and E. were little girls can be interpreted to mean more than simply a childlike belief that a big person can fall on and hurt a smaller person. When defendant finally admitted that he touched A.'s vagina, he expounded, "It hurts, you know?" "I told myself, 'I cannot do this.'" "'She's a little girl.' I was hurt, you know?"

21

The court found defendant exercised analytical ability in the interview when he stated that if he did not stop his conduct with A., it could lead to bad consequences.

*Miranda* strikes a subtle balance between two competing concerns presented by custodial interrogations. (*Moran*, *supra*, 475 U.S. at p. 426.) On the one hand, police questioning is a necessary tool "for effective enforcement of criminal laws" and for meeting "society's compelling interest in finding, convicting, and punishing those who violate the law." (*Ibid.*) On the other hand, a suspect's Fifth Amendment rights must be adequately protected from the coercion inherent in the interrogation process. (*Ibid.*) We see no reason to upset that balance in this case by invading the fact finder's domain. As the Supreme Court has "stressed on numerous occasions, '[one] of the principal advantages' of *Miranda* is the ease and clarity of its application." (*Moran*, at p. 425.) *Miranda* "laid down 'concrete constitutional guidelines for law enforcement agencies and courts to follow.'" (*Dickerson v. United States* (2000) 530 U.S. 428, 435.) Substantial evidence shows these guidelines were properly followed in this case.

### 3. *Coercive Tactics*

Even if a defendant voluntarily, knowingly, and intelligently waives *Miranda* rights, his or her confession is still inadmissible if involuntarily made. (*Dickerson v. United States*, *supra*, 530 U.S. at p. 434.) A confession is involuntary if a defendant's will was overborne, such that the choice to confess was not "'essentially free.'" (*People v. Boyette* (2002) 29 Cal.4th 381, 411 (*Boyette*).)

Defendant contends his statements to Ibarra were involuntary because the officer referenced God, promised leniency, and asked leading questions. He contends his statements to Rodriguez were involuntary because the detective gave him false information and suggested his conduct was not criminal and that E. could not be treated for her vaginal bleeding unless defendant confessed. As to both interviews, defendant

22

asserts he was unusually susceptible to coercive interrogation techniques because he is mentally retarded.

In assessing voluntariness, a court applies a totality of the circumstances test, in which the most important element is whether police coercion was present. (*Boyette*, *supra*, 29 Cal.4th at p. 411.) Absent coercive police activity, a confession is voluntary under the federal and state Constitutions. (*People v. Maury* (2003) 30 Cal.4th 342, 404.) "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*Ibid.*)

"The line to be drawn between permissible police conduct and conduct [inducing] an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.'" (*People v. Hill* (1967) 66 Cal.2d 536, 549.) "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court . . . such motivation is deemed to render the statement involuntary and inadmissible." (*Ibid.*)

"'In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary.'" (*People v. Maury*, *supra*, 30 Cal.4th at p. 404.) "'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject

23

to independent review.'" (*Boyette*, *supra*, 29 Cal.4th at p. 411.) The factual circumstances surrounding the confession include "'the characteristics of the accused and the details of the interrogation.'" (*People v. Benson* (1990) 52 Cal.3d 754, 779.)

With these principles in mind, we independently review the totality of the circumstances to determine whether defendant's statements to Ibarra and Rodriguez were made voluntarily. We first address defendant's assertions concerning Ibarra, i.e., that the officer made religious references, promised leniency, and asked leading questions.

Ibarra initiated the interview by referring to defendant's unsolicited comments made on the way to the police station. Specifically, Ibarra mentioned defendant had talked about God; Ibarra said it was good that defendant went to Victory Outreach to change his ways. Ibarra mentioned these topics again when defendant referenced God in the interview and stated he had sworn on the Bible he did not molest A. After both of these instances, defendant continued to deny the allegations against him.

Subsequently, the following colloquy transpired:

Ibarra: "Be honest with me. God is everywhere, just like you said. Put it on the [B]ible."

Defendant: "I put it on the [B]ible."

Ibarra: "Put it on the [B]ible like you said you want to. Be honest with me [about] what really happened? 'Cause I know certain things at this point that uh, you're not being truthful with me; okay? You're not being truthful with me. I know a lot . . . I know a little bit more than what you think that I know. So I want you to tell me the truth. I'm gonna let you start over again. Tell me the truth, what happened? And that's . . . what's gonna get you back on that road that you want to. You got to get it off your chest."

Defendant then admitted he touched the side of A.'s vagina, but did not show her his private parts.

24

On appeal, defendant contends Ibarra's reliance on defendant's religion was coercive and improper because the officer knew defendant might be feeling religious anxiety. But Ibarra's first two references to God during the interview did not stop defendant from continuing to deny his guilt. Thus, those comments "do not appear to have been a motivating cause behind defendant's subsequent confession." (*People v. Kelly* (1990) 51 Cal.3d 931, 951-953 [after officer commented on defendant's Christian upbringing and belief in going to heaven someday, defendant still denied involvement in crimes]; compare *People v. Adams* (1983) 143 Cal.App.3d 970, 979-980, disapproved on a different ground in *People v. Hill* (1992) 3 Cal.4th 959, 995, fn. 3 [defendant interrogated by sheriff friend who attended same church as her, knew she worked at a Christian bookstore and was suffering from nervousness and trouble sleeping, and told defendant that, if she lied, God would turn His back on her and she might suffer a nervous breakdown].) Ibarra's subsequent comments, which preceded defendant's confession, exhorted him to tell the truth, get it off his chest, and get back on the road to becoming a better person. These are noncoercive benefits which flow naturally from an honest course of conduct. (*People v. Howard* (1988) 44 Cal.3d 375, 398; *People v. Carrington* (2009) 47 Cal.4th 145, 176 [detective's comments "that 'purg[ing] it all' was morally the right thing to do and would provide [defendant] with psychological relief" were not coercive]; *People v. Davis* (2009) 46 Cal.4th 539, 600 [merely advising suspect it would be better to tell the truth does not render confession involuntary].)

Defendant also contends Ibarra's reference to getting "back on that road" suggested defendant could go back to Victory Outreach if he confessed. This interpretation is "excessively strained." (*Kelly*, *supra*, 51 Cal.3d at p. 949.) The more likely interpretation is that the "road" refers to defendant's expressed desire to become a better person. "While not entirely free of ambiguity, the officer's remark, viewed in context, simply fails to resonate with the coercive force urged by defendant." (*Ibid.*)

25

Indeed, defendant himself interprets the remark as referring to his getting back on the road to redemption.

Finally, as to Ibarra, defendant contends the officer asked him leading questions after the 20-minute break in the tape — the part of the interview (after the break) when Ibarra summarized the unrecorded conversation that had transpired. But these questions did not elicit new information. They merely asked defendant to restate what he had said earlier.

As to Rodriguez, defendant contends the detective suggested defendant's conduct with E. was not criminally punishable when Rodriguez said: "[S]ometimes we do things in life that . . . we later regret. . . . [W]e're human, okay. I'm human, my partner's human, you're human[,] we all make mistakes, nobody's perfect. I know I'm far from being perfect okay. You know a lot of times we do things, John, at the moment you know they may seem right but then later on after we do them you know what[,] maybe that was a bad choice or that was a wrong decision, okay? And I think that that's what happened here. . . . I don't think you intended . . . to hurt [E.] I know you love her very much, right?" "I just think that there's an error in judgment here, . . . something happened that . . . it was a mistake, . . . you weren't thinking right at the time for whatever reason, and after it happened you said . . . , I was wrong I shouldn't have done that. . . . I'm not saying that . . . you're sick [or] that you're a pervert or anything like that." Contrary to defendant's assertion, these passages in no way suggested his misconduct was not a crime or was not punishable.

Defendant also contends Rodriguez suggested E. could not be treated for her bleeding unless defendant confessed. In fact, defendant himself brought up this subject by insisting that a doctor said E.'s bleeding was due to hormones. Rodriguez said the doctor suggested this *before* E. revealed what defendant had done to her, and that the doctors could only properly treat E. if they knew what had happened to her. Rodriguez then said, "So, why don't you explain to us what really happened. Okay, so they can help

26

her."  This was not a threat, a promise of leniency, or an undue influence that would overbear defendant's will to resist.  (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1483.)

Defendant also complains that Rodriguez made false statements such as that defendant's DNA was found in E.'s vagina.  Deception does not invalidate a confession so long as "'the deception was not of a type reasonably likely to procure an untrue statement.'"  (*People v. Thompson* (1990) 50 Cal.3d 134, 167; *People v. Watkins* (1970) 6 Cal.App.3d 119, 125.)  This was not the case here.

In sum, defendant's statements were voluntary and the court did not err by denying his Evidence Code section 402 motions to suppress them.

DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

27